**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN O'HARTZ,<br><br>      Plaintiff,<br><br>  v.<br><br>CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU GROUP LONG TERM DISABILITY PLAN,<br><br>      Defendant | No. C-07-0415 MMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

    Before the Court are (1) plaintiff Susan O'Hartz's motion for summary judgment and (2) defendant California State Automobile Association Inter-Insurance Bureau Group Long Term Disability Plan's cross-motion for summary judgment, each brought pursuant to Rule 56 of the Federal Rules of Civil Procedure and filed October 5, 2007.[1] Having considered the papers filed in support of and in opposition to the motions, the Court hereby rules as follows.

---

[1] On June 25, 2008, the parties filed a stipulation, requesting an opportunity to submit supplemental briefing on the issue of the standard of review, in light of the United States Supreme Court's recent decision in Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343 (2008). The stipulation was approved and the parties filed their respective supplemental briefs on July 9, 2008 and July 17, 2008.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff was employed as a call center manager at the California State Automobile Association ("CSAA") from August 3, 1998 to April 2, 2003. (See Decl. of C. Mark Humbert in Support of Def.'s Mot. for Summary J., Ex. A (Administrative Record, hereinafter "U/A") at U/A 0006, 0308). During her employment, she was a participant in CSAA's group short term disability policy ("STD policy") and long term disability policy ("LTD policy"), which were both insured and administered by Unum Life Insurance Company of America ("Unum"). (See Complaint ¶¶ 3, 5.)

Plaintiff began experiencing back pain in January 2002. (See U/A 0014.) On October 21, 2002 plaintiff began receiving treatment from Godwin Maduka, M.D. ("Dr. Maduka"), an orthopedist. (See U/A 0136.) Dr. Maduka used epidural injections to treat plaintiff's back pain, initially once a month through December 2002. (See U/A 0208-10.) In December 2002, Dr. Maduka diagnosed plaintiff as having "mild diffuse disc bulge" and "annular tears" at the lumbar level, with "no central canal or neural foraminal stenosis seen at any level." (See U/A 0104.)

Also in December 2002 plaintiff was receiving care from C.G. Clark, M.D. ("Dr. Clark"), a psychiatrist. (See U/A 0378.) Dr. Clark determined plaintiff was having difficulty getting to work on time due to attention deficit disorder, anxiety, and Epstein Barr syndrome. (See id.) He recommended a flexible work schedule that allowed plaintiff to arrive at work up to thirty minutes late for an estimated period of one year. (See id.)

Plaintiff's last day at work was December 10, 2002,[3] and her date of disability is December 14, 2002. (See U/A 0304.) Plaintiff applied for STD benefits based on both her back pain and her psychological conditions. (See U/A 0429-30 (letter from Unum requesting documentation to support both claims).)

In February 2003, plaintiff sought treatment from a new psychiatrist, John G. Waite,

---

[2]The following facts are either undisputed or read in the light most favorable to plaintiff.

[3]Plaintiff was officially terminated on April 2, 2003. (See U/A 0308.)

2

1 M.D. ("Dr. Waite"), who diagnosed her with "adult ADHD, depression, Epstein Barr
2 syndrome, [and] psychosocial stressors," and determined her Global Assessment of
3 Functioning ("GAF") score to be 50 out of 100.[4]  (See U/A 0156.)  In March 2003, Dr. Waite
4 reported plaintiff's "mood and affect [were] improved" as a result of her taking Zoloft, an
5 antidepressant.  (See U/A 0156.)  In April 2003, plaintiff reported to Dr. Waite that "the
6 medication [did] seem to be helping."  (See id.)

7 In March 2003, plaintiff consulted with an orthopedic surgeon, John S. Thalgott, M.D.
8 ("Dr. Thalgott"), who recommended surgery for her back pain, specifically spinal fusion.
9 (See U/A 0370.)  According to entries in plaintiff's medical records, plaintiff did not trust Dr.
10 Thalgott and did not want to return to him for treatment, (see U/A 0095, 0197, 0223); as an
11 alternative, plaintiff was looking into an "endoscopic surgical option" and was "not
12 comfortable with invasive back surgery," (see U/A 0308).  Plaintiff received two additional
13 epidural injections from Dr. Maduka for her back pain, on March 6, 2003 and May 15, 2003,
14 respectively.  (See U/A 0200, 0107).  Plaintiff did not see Dr. Maduka again until
15 September 2003, (see U/A 0193), after which she received one further epidural injection,
16 on October 7, 2003, (see U/A 0189).

17 On May 13, 2003 Dr. Waite determined plaintiff's GAF score to be 40 out of 100.[5]
18 (See U/A 0396.)  Dr. Waite did not reassess plaintiff's GAF score on her next visit, June 17,
19 2003.  (See U/A 0219.)  Rather, he noted plaintiff wanted to "get on with her life," and he
20 refilled her prescriptions.  (See id.)

---

[4]"A GAF of 41-50 means that the [individual] exhibits '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).'" Tagger v. Astrue, 536 F. Supp. 2d 1170, 1173 n.4 (C.D. Cal. 2008) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000) ("DSM-IV-TR")).

[5]"A GAF of 31-40 indicates '[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).'" Tagger, 536 F. Supp. 2d at 1173 n.3 (citing DSM-IV-TR) (emphasis added).

Unum reviewed plaintiff's file and extended plaintiff's disability benefits, initially through January 28, 2003, and again through March 15, 2003. (See U/A 0308.) On May 15, 2003 Unum referred plaintiff's file for review. (See id.) Thereafter, in a report dated May 21, 2003, Unum's employee, Pamela Ritchhart, R.N. ("Ritchhart"), reviewed plaintiff's file. (See U/A 0121.) Ritchhart noted therein plaintiff's May 13, 2003 GAF score of 40 and Dr. Clark's December 2002 recommended accommodations, which in Ritchhart's opinion appeared reasonable. (See id.) Ritchhart further noted it was "unclear" from the available medical records what had been "going on" with plaintiff from March 2003 to May 2003 and that it "[did] not appear reasonable" to restrict plaintiff to no work. (See id.)

Unum's consultant, Kevin Hayes, M.D. ("Dr. Hayes"), reviewed plaintiff's file on May 29, 2003. (See U/A 0420.) Dr. Hayes agreed with Ritchhart's assessment. (See id.) In particular, Dr. Hayes noted an absence of psychotherapy treatment notes, and stated that plaintiff's treatment status "remain[ed] unclear, but would seem amenable to being conducted concurrent[ly] with work." (See id.)

By letter dated June 6, 2003, Unum informed plaintiff that it had approved plaintiff's STD benefits through May 28, 2003, a date two weeks after plaintiff's last documented epidural injection, (see U/A 0429), and approximately two weeks prior to June 13, 2003, the end of plaintiff's maximum period of eligibility for STD benefits, (see U/A 0149). In its letter of June 6, 2003, Unum advised plaintiff that in order to receive benefits beyond May 28, 2003, plaintiff needed to provide additional medical documentation within fourteen days thereof. (See U/A 0429-30.) Thereafter, in a letter dated June 20, 2003, Unum reminded plaintiff that it had not received the requested documentation, and advised her that it would close her file if it did not receive the documentation by June 27, 2003. (See U/A 0438-39.)

On July 25, 2003, Unum informed plaintiff that her claim for LTD benefits did not appear to be supported by the information in her file, and asked plaintiff to supply additional documentation by August 15, 2003. (See U/A 0150.) Unum advised plaintiff that if she did not qualify for the maximum period of STD benefits, she could not qualify for LTD benefits. (See U/A 0149.) On August 19, 2003, Unum informed plaintiff that it had not received any

4

additional documentation from plaintiff, and therefore was closing her claim for LTD benefits.[6]  (See U/A 0163.)

On September 16, 2003 plaintiff appealed Unum's decision.  (See U/A 0172.)  In a report dated September 26, 2003, Unum's employee, Donna Estudio, R.N. ("Estudio"), reviewed plaintiff's entire file.  (See U/A 0468-69.)  Estudio noted therein that plaintiff's condition appeared to be improved as of April 16, 2003, in that plaintiff appeared "more relaxed" and reported that her medication was "helping."  (See id.)  Thereafter, on October 3, 2003, Unum informed plaintiff that the information in her file did not support a continuation of STD benefits beyond May 28, 2003.  (See U/A 0558-60.)

On October 3, 2003, plaintiff again appealed Unum's decision.  (See U/A 0179.)  In a report dated October 27, 2003, Unum's employee, Susan Fred, R.N. ("Fred"), reviewed plaintiff's entire file.[7]  (See U/A 0222-24.)  The report discussed plaintiff's February 2003 GAF score of 50, her May 2003 GAF score of 40, and her pain levels as reported to her treating physicians.  (See id.)  Fred also noted that plaintiff's records indicated plaintiff was not experiencing any side effects from the medications she was taking.[8]  (See U/A 0222-23.)  With respect to plaintiff's physical condition, the report stated plaintiff could reasonably return to full-time work capacity with a limitation of lifting no more than twenty to thirty pounds and no repetitive bending, twisting, or stooping.  (See U/A 0224.)  With respect to plaintiff's mental condition, the report stated plaintiff's level of psychiatric treatment did not

---

[6]The record indicates Unum did in fact receive additional documentation before its August 15, 2003 deadline.  On July 23, 2003, Unum received treatment notes from Dr. Maduka for the period October 21, 2002 to May 16, 2003.  (See U/A 0159.)  On July 26, 2003, Unum received treatment notes from Dr. Waite dated February 11, 2003 to June 17, 2003.  (See U/A 0153-57.)

[7]On October 17, 2003, Dr. Maduka submitted to Unum additional treatment notes for the period May 16, 2003 through October 8, 2003.  (See U/A 0185-215.)  On October 23, 2003, Dr. Waite submitted to Unum additional treatment notes for the period June 17, 2003 through September 10, 2003.  (See U/A 0218-20.)

[8]For example, in the "medication" section of a form completed in March 2003, Dr. Maduka stated plaintiff was taking Percocet, and in response to the question "Is the patient experiencing any side effects?" Dr. Maduka indicated "No."  (See U/A 0374.)  In the "medications" section of a form completed in May 2003, Dr. Waite stated plaintiff was taking Adderall with "no side effects."  (See U/A 0396.)

1 support an impairment that would prevent her from working full time.  (See id.)  Fred
2 referred the file for orthopedic and psychiatric review to obtain confirmation of her findings,
3 with specific questions for each reviewer.[9]  (See id.)

4      On November 6, 2003 Unum's consultant, John Bolinger, M.D. ("Dr. Bolinger"),
5 conducted a psychiatric review to address Fred's questions.  (See U/A 0237-38.)  In his
6 report, Dr. Bolinger acknowledged plaintiff's February 2003 GAF score of 50, but did not
7 mention her May 2003 GAF score of 40.  (See U/A 0238.)  Dr. Bolinger observed that
8 although pain could exacerbate ongoing psychiatric problems, the record indicated plaintiff
9 experienced "consistently good pain relief" from Dr. Maduka's treatment.  (See id.)  Dr.
10 Bolinger was of the opinion that "the psychiatric symptoms . . . documented in the file [were]
11 not of sufficient severity to prohibit [plaintiff] from performing the duties of her job as a
12 customer care center supervisor if she were so motivated."  (See id.)

13      On November 19, 2003, Unum's consultant, George Z. Seiters, M.D. ("Dr. Seiters"),
14 conducted an orthopedic review to address Fred's questions.  (See U/A 0242, 0606.)  Dr.
15 Seiters concluded "the clinical information available for review [was] consistent with
16 orthopedic impairment related to the lumbar spine."  (See id.)  In Dr. Seiters's opinion,
17 reasonable restrictions and limitations would include avoiding "repetitive bending and
18 twisting," "lifting in the DOT light to medium category" and "accommodation for frequent
19 change of position."  (See id.)  He further stated that "the clinical information available [was]
20 consistent with temporary [restrictions and limitations] pending the outcome of the current
21 pain management program," but that "the exact duration" of such restrictions and limitations

---

[9] In particular, Fred sought responses from the orthopedic reviewer to the following questions: whether plaintiff's "impairment [was] supported" by the documentation; what were "reasonable [restrictions and limitations]" from December 14, 2002 to October 27, 2003; whether there were "appropriate [restrictions and limitations]" and "of what duration"; whether plaintiff's "reported complaints and symptoms [were] credible and consistent"; and whether plaintiff was "receiving appropriate treatment for her reported symptoms and condition."  (See U/A 0224.)
Fred sought responses from the psychiatric reviewer to the following questions: whether plaintiff's "impairment [was] supported" by the documentation; what were "reasonable [restrictions and limitations] . . . based on [plaintiff's] psychological condition"; and whether there were "appropriate" restrictions and limitations and "of what duration."  (See id.)

1 could not be determined. (See id.) With respect to plaintiff's credibility, he found plaintiff's
2 abnormal discogram "while controversial, could be consistent" with plaintiff's reported
3 symptoms. (See id.) Finally, Dr. Seiters found "the clinical information [was] consistent
4 with appropriate treatment for the symptoms and diagnoses noted." (See id.)

5       On December 2, 2003, Alan L. Ey, M.Ed., CRC, CDMS ("Ey"), an occupational
6 consultant retained by Unum, evaluated plaintiff's ability to perform her own occupation,
7 based on the job description provided by plaintiff's employer and Dr. Seiters's orthopedic
8 evaluation. (See U/A 0606.) In Ey's opinion, plaintiff could perform her own occupation with
9 the restrictions noted by Dr. Seiters, because her occupation was sedentary, did not require
10 repeated bending and twisting or heavy lifting, and provided enough autonomy to allow for
11 frequent changes of position. (See U/A 0607.)

12       On December 3, 2003, plaintiff sent Unum a letter pointing out therein that Unum had
13 "not addressed [her] Epstein Barr virus." (See U/A 0259-60.) Thereafter, on December 9,
14 2003, Unum's employee, Molly Sones, R.N. ("Sones"), completed a review of the
15 information in plaintiff's file pertaining to Epstein Barr virus, (see U/A 0617), and noted in her
16 report that the test results for plaintiff's Epstein Barr virus infection were from March 2001,
17 almost two years before plaintiff's date of disability. (See id.) Sones further noted that
18 plaintiff had been working with such condition until December 2002, and that the available
19 documentation did not indicate a significant change in her condition that would have
20 prevented her from continuing to work after December 2002 by reason of the Epstein Barr
21 virus. (See id.)

22       Unum's employee, Nancy Beecher, M.D. ("Dr. Beecher"), also reviewed the evidence
23 in plaintiff's file pertaining to Epstein Barr virus; she completed her review on January 27,
24 2004. (See U/A 0627.) Dr. Beecher stated in her report that most adults would show
25 evidence of a past Epstein Barr virus infection by age twenty, that plaintiff's "infection
26 probably occurred . . . over 20 yrs ago," and that in her opinion the virus had "no
27 significance" with respect to plaintiff's present health. (See id.)

28       In a letter dated January 28, 2004, Unum advised plaintiff of its final determination

7

that "the decision to terminate STD benefits and deny LTD benefits was appropriate," based on the information in plaintiff's file pertaining to her back pain and psychological conditions. (See U/A 0284-88.) Unum supported its determination with references to the above-noted findings of its reviewers. (See id.)

**DISCUSSION**

The STD policy defines "short term disability" as follows:

> "You are disabled when Unum determines that due to your sickness or injury:
> - you are unable to perform the material and substantial duties of your regular occupation; and
> - you are not working in any occupation."

(U/A 0708.)[10]

The LTD policy defines "long term disability" as follows:

> "You are disabled when Unum determines that:
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education training or experience."

(U/A 0048.)[11]

Plaintiff argues Unum abused its discretion in terminating her STD benefits and denying her LTD benefits. (See Plf's Supp. Brief at 1:8-12.) Plaintiff contends, in essence, that Unum abused its discretion in finding plaintiff was able "to perform the material and substantial duties of [her] regular occupation" as of May 28, 2003. (See id.; see also U/A 0708.) Defendant argues Unum's denial was supported by substantial evidence in the administrative record. (See Def's Supp. Brief at 6:11-7:9.)

---

[10] The STD policy further provides for a "maximum period of payment" of "25 weeks excluding [a] 7 day elimination period." (See U/A 0697, 0713.)

[11] The LTD policy contains a 180-day "elimination period," during which the claimant must be "continuously disabled"; (see id.); according to Unum, plaintiff's elimination period began on December 14, 2002. (See U/A 0286).

8

**A. Standard of Review**

Where, as here, "the wording of the plan confers discretion on the plan administrator"[12] and "the plan administrator has a conflict of interest,"[13] an "abuse of discretion review, tempered by skepticism commensurate with the plan administrator's conflict of interest, applies." See Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 959 (2006); see also Metropolitan Life, 128 S.Ct. at 2348 (holding structural conflict of interest exists where insurance company providing policy also acts as plan administrator).

The court may view a conflicted administrator's decision with a low level of skepticism "if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." See Abatie, 458 F.3d at 968. On the other hand, the court may view the decision with a higher level of skepticism if, for example, "the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." See id. at 968-69 (citations omitted). The court, in essence, is "making something akin to a credibility determination about the . . . plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." See id. The court "must determine the extent to which the conflict influenced the administrator's decision and discount to that extent the deference [accorded] the administrator's decision." See Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008) (interpreting Abatie).

Recently, in Metropolitan Life, the Supreme Court set forth the procedure to be

---

[12]The policy provides: "When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (U/A 0044, 0703.)  The parties do not dispute such policy language confers discretion on the plan administrator.

[13]Defendant concedes that Unum, as both the funding source and the plan administrator, has a structural conflict of interest.  (See Def.'s Supp. Brief at 6:8-10.)

9

1  followed by a reviewing court where "a plan administrator both evaluates claims for benefits
2  and pays benefits claims." See Metropolitan Life, 128 S.Ct. at 2348.  In analyzing the issue,
3  the Supreme Court held the standard of review remains deferential rather than de novo, and
4  that structural conflict is a "factor" to be "taken into account" along with any other relevant
5  factors.  See id. at 2350.  As the Supreme Court explained, such conflict "should prove more
6  important (perhaps of great importance) where circumstances suggest a higher likelihood
7  that it affected the benefits decision, including, but not limited to, cases where an insurance
8  company administrator has a history of biased claims administration," and "should prove
9  less important (perhaps to the vanishing point) where the administrator has taken active
10 steps to reduce potential bias and to promote accuracy, for example, by walling off claims
11 administrators from those interested in firm finances, or by imposing management checks
12 that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  See
13 id. at 2351.  This Court sees no inconsistency between the Ninth Circuit's holding in Abatie
14 and the Supreme Court's decision in Metropolitan Life, and accordingly, in reviewing the
15 record herein, will be guided by the analyses provided in both decisions.

16       Generally, "a district court may review only the administrative record when
17 considering whether the plan administrator abused its discretion."  See Abatie, 458 F.3d at
18 970.  The court may, however, "consider evidence outside the administrative record to
19 decide the nature, extent, and effect on the decision-making process of any conflict of
20 interest."  See id.  "[T]he decision on the merits, though, must rest on the administrative
21 record once the conflict (if any) has been established, by extrinsic evidence or otherwise."
22 See id.

23       Here, plaintiff requests the Court take judicial notice of fifteen exhibits extrinsic to the
24 administrative record.  (See Request for Judicial Notice ("RJN") Exhibits 1 through 15.)
25 Exhibits One and Two consist of settlement agreements Unum entered in November 2004
26 with the Maine Bureau of Insurance.  Exhibit Three consists of Unum's October 2005 with
27 the California Department of Insurance.  Exhibits Four through Ten consist of information
28 printed from the website www.drugs.com regarding side effects of the medications Adderall,

10

1  DextroStat, Zoloft, Vioxx, Soma, Percocet, and Naproxen.  Exhibits Eleven through
2  Fourteen consist of publications by the American Psychiatry Association and the American
3  Academy of Psychiatry and the Law regarding ethics in the practice of psychiatry.  Exhibit
4  Fifteen is a copy of the GAF Scale from the Diagnostic and Statistical Manual of Mental
5  Disorders (4th edition).

6        Of the above referenced evidence, only Exhibits One, Two and Three, specifically the
7  settlement agreements Unum entered into with the Maine Bureau of Insurance and the
8  California Department of Insurance, pertain to any potential conflict of interest.  (See RJN
9  Exs. 1-3.)  Contrary to plaintiff's argument, however, those exhibits do not constitute an
10  "admission" by Unum of procedural unfairness.  (See Pl.'s Supp. Brief, filed October 5,
11  2007, at 4:18.)  By their own terms, the agreements expressly so state.  (See RJN Ex. 1 at
12  13, ¶ 12; Ex. 2 at 13, ¶ 10; Ex. 3 at 2, ¶ E.)

13        To the extent plaintiff seeks to introduce Exhibits Four through Fifteen, plaintiff has
14  failed to show any of such exhibits are relevant to the issue of Unum's conflict of interest,
15  and to the extent plaintiff argues such exhibits, which were not part of the administrative
16  record, are relevant to the merits of her claim, the Court, as noted, may not consider them.
17  See Abatie, 458 F.3d at 970 (holding consideration of merits must be confined to
18  administrative record).  Accordingly, plaintiff's request for judicial notice of Exhibits Four
19  through Fifteen is hereby denied.

20        Plaintiff further argues Unum's decision should be viewed with skepticism, because
21  its medical reviewers were biased.  (See Pl.'s Supp. Brief at 3:5.)  Plaintiff fails, however, to
22  offer evidence of bias, and simply notes that all of Unum's medical reviewers were its
23  employees or consultants.  (See id. at 3:24.)  To the extent any such relationship exists,
24  however, the Court will take it into consideration, along with all of the other relevant
25  evidence, in evaluating the merits of plaintiff's claim that Unum abused its discretion in
26  denying her benefits.

27        Plaintiff's argument that Unum's reviewers "cherry picked" the evidence, by ignoring
28  plaintiff's complaints of pain, her medication regimen, and her May 2003 GAF score of forty,

11

1 likewise will be considered in the context of the merits of plaintiff's claim.

2 Accordingly, based on the above, the Court will apply an abuse of discretion review
3 tempered by a modest degree of skepticism.

**B. Unum's Exercise of Discretion**

"An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." Boyd v. Bell, 410 F.3d 1173, 1178 (9th Cir. 2005). Here, plaintiff does not suggest that Unum rendered its decision without explanation or misconstrued provisions of the plan; rather, plaintiff's argument is, in essence, that Unum relied on clearly erroneous findings of fact. "A finding is 'clearly erroneous' when although there is evidence to support it," the court, after considering all the evidence, "is left with the definite and firm conviction that a mistake has been committed." See id.

Plaintiff makes essentially four arguments in support of her claim that Unum abused its discretion in finding her capable of performing the "material and substantial duties" of her regular occupation, specifically: (1) Unum's reviewing psychiatrist, Dr. Bolinger, ignored her reports of pain; (2) Unum's reviewers ignored the side effects of her medication; (3) Dr. Bolinger ignored her May 2003 GAF score of 40; (4) Unum's occupational review failed to address her medication, pain, and psychological conditions.[14] The Court will address each argument in turn.

First, plaintiff argues Dr. Bolinger ignored plaintiff's reports of pain when Dr. Bolinger stated in his review that plaintiff received "consistently good pain relief" from Dr. Maduka's treatments. (See Pl.'s Mot. at 11-13.) Dr. Bollinger did consider plaintiff's reports of pain; in his opinion, however, given the relief plaintiff obtained from Dr. Maduka's treatments, it was

---

[14] Plaintiff also argues Unum's psychiatric file review is not entitled to deference, because it did not entail an in-person evaluation. (See Pl.'s Mot. at 14-22.) Dr. Bolinger, however, is not purporting to provide a diagnosis in the first instance, but rather his assessment of the findings in the record. The Court will consider the nature and source of Dr. Bolinger's opinion with all of the evidence bearing on the issue of its sufficiency.

12

not sufficient to elevate plaintiff's psychiatric diagnosis to a level of disability. (See U/A 0238 ("While pain could certainly aggravate and exacerbate ongoing psychiatric pathology, the treatment records report consistently good pain relief with the treatment interventions offered by Dr. Maduka.").)

Second, plaintiff argues Unum's reviewers ignored the side effects of her medication. (See Pl.'s Mot. at 13.) Unum's reviewers, however, relied on the treatment notes from plaintiff's physicians, who stated plaintiff experienced no such side effects. (See U/A 0374 (treating physician note stating no side effects from Percocet); see also U/A 0396 (treating physician note stating "no side effects" from Adderall).) Plaintiff points to no other evidence in the administrative record demonstrating the existence of side effects.

Third, plaintiff argues Dr. Bolinger ignored plaintiff's May 13, 2003 GAF score of 40. (See Pl.'s Mot. at 22-23.) In his report, Dr. Bolinger erroneously described plaintiff's "current GAF" score as 50. (See U/A 0238.) The record both Dr. Bolinger and Unum had available at that time, however, clearly showed plaintiff's GAF score had decreased to 40, (see, e.g., U/A 0223, 0396 (referencing plaintiff's May GAF score of 40)), a significant finding indicating plaintiff, approximately two weeks before Unum terminated her disability benefits, was suffering major impairment in several areas, including work.

On the GAF scale, a lower score reflects a lower level of functioning. See, e.g., Tagger, 536 F. Supp. 2d at 1173-74 nn.3, 4, 6 & 8. Defendant fails to offer a persuasive explanation as to why, if plaintiff's GAF score had deteriorated to 40 as of May 13, 2003, she was found to be no longer disabled as of May 29, 2003.[15]

Lastly, plaintiff argues Unum's occupational review failed to address her medication, pain, and psychological conditions. (See Pl.'s Mot. at 23.) Although Dr. Seiters's orthopedic review, on which Ey relied, did not mention medication, (see U/A 0242), there was no

---

[15]Defendant argues plaintiff was functional from a psychological standpoint on her last day of employment, and consequently plaintiff's GAF scores at a point in time after she left work are immaterial. (See Def.'s Opp. at 8.) Unum, however, twice extended plaintiff's disability benefits, initially through January 28, 2003, and again through March 15, 2003. (See U/A 0308.) Thus, Unum's decision not to extend her disability benefits beyond May 28, 2003 was based on her condition at that time.

13

1 indication in the record that plaintiff's medications caused her to experience any side effects,
2 and indeed the medical records clearly stated she had none, (see U/A 0374, 0396).
3 Further, while Ey's occupational report did not expressly reference plaintiff's complaints of
4 pain, it did reference Dr. Seiter's orthopedic review, which discusses in detail plaintiff's
5 reports of pain.  (See U/A 0606-07; see also U/A 0242.)

6       Ey, however, did not consider plaintiff's psychological condition.  Rather, Ey's review
7 was based solely on plaintiff's job description and Unum's orthopedic review, (see U/A
8 0606), whereas plaintiff's disability claim was based on a combination of both her back pain
9 and her psychological condition.  An opinion based on an incomplete set of assumptions
10 cannot be considered a valid basis for a determination.  See, e.g., Osenbrock v. Apfel, 240
11 F.3d 1157, 1165 (9th Cir. 2001) (holding "[a]n ALJ must propound a hypothetical to a VE
12 [vocational expert] that is based on medical assumptions supported by substantial evidence
13 in the record that reflects all of the claimants limitations").[16]

14       Here, Unum should have provided Ey with information regarding plaintiff's
15 psychological condition, to allow Ey to make an accurate assessment of plaintiff's ability to
16 perform her own occupation. Plaintiff's occupation required her to possess "strong inter-
17 personal and negotiating skills and the ability to interact with others in a professional and
18 tactful manner," the "[ability] to prioritize work, organize time, and balance multiple projects,"
19 and "strong decision-making, leadership, and motivational skills."  (See U/A 0611.)  Given
20 such requirements, it cannot be disputed that plaintiff's mental state was relevant to her
21 ability to perform her own occupation.  As noted, plaintiff, at the time her benefits were
22 terminated, had an undisputed GAF score of 40, indicating substantial functional
23 impairment.  Indeed, even Unum's independent medical examiner, Dr. Bolinger, reported to
24 Unum that  "the current information in the file does support a diagnosis of dysthemia and

---

28 [16]The Court recognizes the law applicable to Social Security determinations is not necessarily applicable under ERISA.  The particular concept under discussion, however, is not one limited to any particular class of cases.

14

ADD." (See U/A 0238) (emphasis added).)[17]  Defendant offers no explanation as to why, under such circumstances, it was proper for Unum to rely on Ey's occupational review.

Because the psychological assessment on which Unum ultimately relied misreported a significant undisputed finding, which finding was made known earlier to Unum, and because the occupational evaluation obtained by Unum and on which Unum relied omitted any assessment of the effect of plaintiff's psychological condition, a significant part of plaintiff's claim, the Court concludes Unum's determination that plaintiff no longer qualified for STD benefits as of May 29, 2003, just two weeks before the date on which plaintiff became eligible to apply for LTD benefits, constituted an abuse of discretion.  Because Unum never reached the merits of plaintiff's claim for LTD benefits, the Court makes no determination herein as to that claim.

**CONCLUSION**

For the reasons stated above, plaintiff's Motion for Summary Judgment is hereby GRANTED, and defendant's Motion for Summary Judgment is hereby DENIED as follows:

1. Plaintiff's STD benefits shall be reinstated effective May 29, 2003, in accordance with the terms of the STD policy.

2. Defendant shall evaluate plaintiff's claim for LTD benefits under the terms of the LTD policy.

3. To the extent plaintiff seeks to recover attorney's fees under 29 U.S.C. § 1132(g), plaintiff shall file a separate motion pursuant to Civil L.R. 54-6.

4. To the extent plaintiff seeks an award of prejudgment interest, plaintiff shall make and support such request in her motion for attorney's fees or by separate motion filed no later than the date on which her motion for attorneys fees is due.

---

[17]The Court further notes that in Unum's final determination letter, Unum misinformed plaintiff that its "medical department concluded that the information in your files does not support a diagnosis of dysthemia and attention deficit disorder (ADD)." (U/A 0286 (emphasis added).)

15

5. Any bill of costs shall be filed in accordance with Civil L.R. 54-1.

**IT IS SO ORDERED.**

Dated: September 3, 2008

_____
MAXINE M. CHESNEY
United States District Judge